```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
PAULINA KORENBLUM, et al.,                                  :
                                                            :
                              Plaintiffs,                   :     15-CV-3383 (JMF)
                                                            :
              -v-                                           :     OPINION AND ORDER
                                                            :
CITIGROUP, INC.,                                            :
                                                            :
                              Defendant.                    :
                                                            :
------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

      Plaintiffs Paulina Korenblum, Fredy Giron, and Kenneth M. Butler bring this action on behalf of themselves and others similarly situated, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York State Labor Law ("NYLL"), N.Y. Lab. Law § 650 *et seq.*  (*See* Compl. (Docket No. 1).  Plaintiffs are current or former employees of information/technology ("IT") vendors affiliated with Defendant Citigroup, Inc. ("Citi").  They allege that certain types of billing arrangements Citi maintained with its IT vendors — known as "Professional Day" or "Professional Week" plans (each, a "Professional Plan") — denied them overtime wages in violation of federal and New York law.  On March 4, 2016, after roughly three months of discovery "limited" to "issues bearing on preliminary certification of a collective action" (Docket No. 48), Plaintiffs moved for conditional certification of an FLSA collective action.  For the reasons that follow, Plaintiffs' motion is DENIED in its entirety.

## BACKGROUND

      The named Plaintiffs, and eleven of the twelve plaintiffs who have opted in to this action thus far, are all current or former employees of the same IT vendor: the Judge Group, Inc.

("Judge"). Judge's workers, along with the workers of thirty-nine other IT vendors, provide services (ostensibly as independent contractors) to various Citi affiliates throughout the country pursuant to a so-called Professional Plan billing arrangement. The details of the Professional Plans vary, but they all share one salient characteristic: Certain hours worked by the IT employees are designated as "unbillable." For instance, under the typical Professional Day arrangement, Citi pays IT vendors for a "ten-hour work day," pursuant to which the first eight hours that the IT vendors' employees work in a given day are billable to Citi, the ninth and tenth hours are "unbillable," and the eleventh and subsequent hours are again billable. (*See* Mem. Law Supp. Pls.' Mot. Court-Authorized Notice (Docket No. 73) ("Pls.' Mem.") 5-6). Under the typical Professional Week arrangement, Citi pays IT vendors for a "forty-hour work week," pursuant to which the first forty hours that the IT vendors' employees work in a given week are billable to Citi, hours forty through fifty are "unbillable," and subsequent hours are again billable. (*Id.*). While Citi maintains that the Professional Plans are merely "billing arrangements" and have no bearing on compensation of workers themselves, Plaintiffs contend that "unbillable" hours were also uncompensated. (*Id.* at 6).

Plaintiffs now move for conditional certification of an FLSA collective action consisting of "all hourly-paid [Professional] Plan Workers at Citi who worked under Professional Pay Plans and performed overtime work without receiving all wages owed for such work, at any time between April 30, 2012 and the present." (*Id.* at 21). That collective encompasses approximately 7,500 workers associated with forty different Citi vendors at approximately seventy different worksites. In support of their motion, Plaintiffs submit, among other things, declarations from the three named Plaintiffs and twelve opt-in plaintiffs — all but one of whom, as noted, were (or are) employed by a single IT vendor, Judge. (*See* Decl. Molly A. Brooks Supp. Pls.' Mot. Court-

2

Authorized Notice (Docket No. 74) ("Brooks Decl."), Exs. 1-15).  In general, each declaration states as follows: that the employee was "recruited" by Judge (or, in the case of the one outlier plaintiff, Axelon Services Corporation ("Axelon")) to work for Citi; that, while at Citi, the employee was a Professional Plan worker, and was not compensated for working hours that were "unbillable" under the applicable Professional Plan; and, lastly, that Citi controlled the employee's work.  (*See id.*).  Plaintiffs do not offer any of their employment contracts with Judge, but do submit the lone non-Judge opt-in plaintiff's employment contract with Axelon.  (*See* Brooks Decl., Ex. 19).  In addition, they present excerpts from a November 2012 deposition of Judge's Chief Operating Officer, taken in connection with a prior action against Judge that settled.  (*See id.*, Ex. 18).  In addition to the foregoing, both parties submit evidence obtained through discovery in this case.  Plaintiffs submit excerpts from the depositions of Citi's two Rule 30(b)(6) witnesses, (*see id.*, Exs. 16-17), and Defendants submitted a declaration from one of those deponents, Donna Gruppuso (*see* Decl. Donna Gruppuso (Docket No. 79) ("Gruppuso Decl.")).  Further, Defendants present excerpts from the depositions of the named Plaintiffs.  (*See* Decl. Michael J. Puma Supp. Citigroup Inc.'s Mem. Law Opp'n (Docket No. 78) ("Puma Decl."), Exs. B-D).  Notably, Plaintiffs do not submit any agreements between Citi and its IT vendors that utilize a Professional Plan billing structure, even though Citi produced the thirty-six such agreements (and nine amendments) it has — including, presumably, its agreements with Judge and Axelon.  (*See* Pls.' Mem. 3 n.6).[1]

---

[1] Although not necessary to the Court's decision, the Court notes that Defendants also present a declaration from Judge's head of accounting and declarations from Professional Plan employees at three of its IT vendors indicating that they are compensated for "unbillable" hours. (*See* Decl. Janice Turano (Docket No. 80) ("Turano Decl."); Decl. Uma Sivasumbramani (Docket No. 92); Decl. Francis Fenelon (Docket No. 91); Decl. Rahul Gadgil (Docket No. 90); Decl. Rajesh Tatooskar (Docket No. 89); Decl. Zaheer Samnani (Docket No. 88); Decl. Nicholas Marra (Docket No. 82); Decl. Nicki McDaniel (Docket No. 81)).

**APPLICABLE LAW**

By its terms, the FLSA allows workers to sue on behalf of both themselves and "other employees similarly situated." 29 U.S.C. § 216(b). When workers seek to bring a so-called "collective action," district courts in the Second Circuit generally follow "a two-step method" to determine which employees, if any, are "similarly situated." *Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010). At the first step, the Court considers — in an exercise of its discretion — whether to "facilitate[e] notice to potential plaintiffs of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." *Id*. at 554 (internal quotation marks omitted). To warrant the authorization of such notice, Plaintiffs have to meet the "low" burden of making a "modest factual showing" that they and "potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Id.* at 555 (internal quotation marks omitted). The key element of that showing is a shared unlawful policy; that is, while the proposed collective need not be "identical in every possible respect," its potential members must be similarly situated with respect to the allegedly unlawful policy or practice. *Chowdhury v. Duane Reade, Inc.*, No. 06-CV-2295 (GEL), 2007 WL 2873929, at *5 (S.D.N.Y. Oct. 2, 2007).

Of course, whether a compensation policy is unlawful frequently turns on the duties, pay rates, and working schedules of the employees it covers. *See Kucker v. Petco Animal Supplies Stores, Inc.*, No. 14-CV-9983 (DF), 2016 WL 237425, at *7-8 (S.D.N.Y. Jan. 19, 2016*)* ("[A]llegations of the mere existence of standardized policies and procedures are not sufficient . . . ."). Thus, in a typical exemption case, for example, conditional certification is warranted when Plaintiffs make "some showing that there are other employees who are similarly situated with respect to their job requirements and with regard to their pay provisions," and "who are

classified as exempt pursuant to" the complained-of policy. *Myers*, 624 F.3d at 555 (internal quotation marks omitted). In other words, although a court does not adjudicate the merits of a claim at the first stage, the elements of, and defenses to, the claim inform the analysis of whether employees are similarly situated. *See Fraticelli v. MSG Holdings, L.P.*, No. 13-CV-6518 (JMF), 2014 WL 1807105, at *2 (S.D.N.Y. May 7, 2014) ("Of course, the Court is not permitted to weigh the merits of Plaintiffs' claims at this stage of the litigation, but the legal standard governing the trainee exception is relevant here because the modest factual showing that Plaintiffs must make under *Myers* is that they were victims of a common policy or plan that *violated the law*." (citations and internal quotation marks omitted)); *Chowdhury*, 2007 WL 2873929, at *5 ("Defendants cannot defeat a § 216(b) motion simply by pointing out all the ways in which plaintiff's exact day-to-day tasks differ from those of the opt-in plaintiffs; instead, defendants must show that plaintiffs are not similarly situated *in ways relevant* to their entitlement to overtime compensation under FLSA . . . .").

Significantly, "[w]hile plaintiff's burden at this [initial] stage is modest, it is not non-existent," and it "cannot be satisfied simply by unsupported assertions." *Khan v. Airport Mgmt. Servs., LLC*, No. 10-CV-7735 (NRB), 2011 WL 5597371, at *4-5 (S.D.N.Y. Nov. 16, 2011), (internal quotation marks omitted); *see also, e.g.*, *Rudd v. T.L. Cannon Corp.*, No. 10-CV-591(TJM/DEP), 2011 WL 831446, at *6 (N.D.N.Y. Jan. 4, 2011) ("Although the standard governing plaintiffs' application is lax and their burden modest, a court must nonetheless take a measured approach when addressing a request for collective action certification, mindful of the potential burdens associated with defending against an FLSA claim involving a large and broadly defined collective group of plaintiffs."). Nevertheless, courts typically decide the question of preliminary certification — not having had the benefit of full discovery — "based on

the pleadings, affidavits and declarations submitted by the plaintiff." *Ji v. Jling Inc.*, No. 15-CV-4194 (JMA) (SIL), 2016 WL 2939154, at *3 (E.D.N.Y. May 19, 2016). For similar reasons, courts do "not resolve factual disputes, decide ultimate issues on the merits, or make credibility determinations" at the first stage. *In re Penthouse Exec. Club Comp. Litig.*, No. 10-CV-1145 (NRB), 2010 WL 4340255, at *2 (S.D.N.Y. Oct. 27, 2010) (internal quotation marks omitted). By contrast, the second stage follows the close of discovery, at which point the employer may move for "decertification" of the collective action and "the district court will, on a fuller record, determine whether . . . the plaintiffs who have opted in are *in fact* 'similarly situated' to the named plaintiffs. The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Myers*, 624 F.3d at 555 (emphasis added).

Where, as here, a conditional certification motion is made after some, but not all, discovery has occurred, it remains an open question whether some kind of "intermediate scrutiny" should apply. Several district courts in other Circuits have reasoned that the degree of scrutiny applied should increase in proportion to the discovery that has been conducted. *See Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 823-28 (N.D. Ohio 2011) (canvassing the various efforts and providing a synthesized approach). By and large, however, district courts in this Circuit have expressly declined to apply any increased scrutiny until discovery closes *in full*. *See Kucker*, 2016 WL 237425, at *9; *Amador v. Morgan Stanley & Co. LLC*, No. 11-CV-4326 (RJS), 2013 WL 494020, at *4 & n.3 (S.D.N.Y. Feb. 7, 2013); *Stevens v. HMSHost Corp.*, No. 10-CV-3571 (ILG) (VVP), 2012 WL 4801784, at *2 & n.5 (E.D.N.Y. Oct. 10, 2012); *Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638, 645-47 (S.D.N.Y. 2010); *Chowdhury*, 2007 WL 2873929, at *3; *Damassia v. Duane Reade, Inc.*, No. 04-CV-8819 (GEL),

2006 WL 2853971, at *4 (S.D.N.Y. Oct. 5, 2006). Indeed, the trend in this Circuit at least *appears* to have solidified into rather strict adherence to either of two standards of review. *See, e.g.*, *Amador*, 2013 WL 494020, at *4 n.4 (rejecting the defendants' arguments "that conditionally certifying an opt-in class is burdensome, often involves 'extensive discovery,' and often leads to settlement before the Court can decide whether to decertify a class at stage two of the *Myers* framework," because "those concerns hardly provide compelling reasons to ignore the Second Circuit's lenient standard set forth in *Myers*").

Closer scrutiny, however, reveals that there is less consensus within the Circuit than might appear at first blush. First, even where courts in this Circuit have ostensibly declined to increase scrutiny after some discovery has taken place, they have considered the evidence obtained in discovery. *See, e.g.*, *Cunningham*, 754 F. Supp. 2d at 647 ("[T]his Court will apply the more lenient first-stage test, although it will consider the evidence obtained in discovery and submitted by both parties in that analysis."); *Amador*, 2013 WL 494020, at *4 n.3 (quoting *Cunningham*'s compromise with approval and appearing to adopt the same approach); *see also Creely*, 789 F. Supp 2d at 826 ("[C]ourts generally agree that allowing the parties to conduct some targeted discovery regarding the conditional certification question takes the question beyond the stage one evidentiary boundaries of the complaint's allegations and supporting affidavits."). In doing so, however, such courts are, at least tacitly, applying a more stringent test than the one stage-one test, which can be satisfied by little more than plaintiffs' *ipse dixit* statements in pleadings or declarations. Second, courts have either applied, or expressly remained open to applying, second-stage scrutiny in the first instance when discovery has been completed. *See Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 123 (S.D.N.Y. 2011) ("Whether the second stage heightened scrutiny *automatically* applies where discovery has closed is open to

7

debate." (emphasis added)); *Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316 (PAC), 2006 WL 2819730, at *9-10 (S.D.N.Y. Sept. 29, 2006) (applying heightened scrutiny when conditional certification was sought following discovery); *see also Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 482 (E.D. Cal. 2006) ("Where discovery is complete, courts sometimes bypass the first tier in favor of immediately making the second-tier factual determination."). At a minimum, that practice is an acknowledgment that discovery from opt-ins themselves is not necessarily needed to evaluate whether putative collective members are sufficiently similarly situated — and, more generally, reflects a flexible approach to what constitutes efficient use of the notification process.

In the Court's view, neither law nor logic supports rigidly applying the same standard of review at all points prior to discovery's close — particularly where, as here, discovery with respect to conditional certification has been completed. The "lenient" or "modest" standard discussed in *Myers* did not set forth an inflexible burden of proof that is incapable of being increased in proportion to the discovery conducted by the parties. In *Myers*, the Second Circuit endorsed a two-stage inquiry as "sensible," but emphasized that it was "not required by the terms of FLSA or the Supreme Court's cases" and that district courts conditionally "certify" collective actions solely by exercising their "'discretion, in appropriate cases.'" *Myers*, 624 F.3d at 554, 555 & n.10 (quoting *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)); *see also Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1530 (2013) ("The sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court." (citations omitted)). Given the discretionary, managerial nature of the inquiry, not to mention the inherent imprecision of words like "modest" and "lenient," a Court's initial review may properly grow

8

more exacting as discovery proceeds.  And at least where discovery on conditional certification has been completed, common sense suggests that it should: Were it otherwise, after all, what would be the point of the discovery?  *See Creely*, 789 F. Supp. 2d at 827 (noting "the absurd result of granting the parties time to do discovery on the conditional certification question but subsequently imposing no incremental hurdle in determining whether Plaintiffs may send opt-in notices").  Failing to acknowledge as much risks misunderstandings that could turn the construct of "conditional certification" on its head, from what "may be a useful 'case management' tool for district courts to employ in 'appropriate cases,'" *Myers*, 624 F.3d at 555 n.10, into an artificial and unnecessary burden on the Court (not to mention on defendants).

      Accordingly, the Court will apply "a modest 'plus'" standard in this case.  *Creely*, 789 F. Supp. 2d at 826.  In particular, and as an initial matter, the Court will look beyond the pleadings and affidavits submitted by Plaintiffs and will consider the evidence submitted by both parties, albeit with an understanding "that the body of evidence is necessarily incomplete."  *Id.*  That is, the Court still will not decide the ultimate merits of the case or issues better suited for a decertification motion.  *See id.* at 827-28.  And the Court draws no negative inferences of any sort where evidence is lacking because Plaintiffs may not have received discovery on the issue.  *See id.* at 826; *see also, e.g.*, *Chowdhury*, 2007 WL 2873929, at *3 (choosing not to deviate from "first stage" review where "defendants have not yet responded to plaintiff's document requests or interrogatories, and plaintiff has not taken any depositions"); *Damassia*, 2006 WL 2853971, at *4 (same where "plaintiffs had not yet had an opportunity to depose *any* of the 56 individuals who submitted affidavits in support of defendant's opposition").  But the additional evidence obtained in discovery should show "that it is more likely that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs" — in other words, that Plaintiffs

have, through discovery, "advanced the ball down the field." *Creely*, 789 F. Supp. 2d at 827; *see also id.* at 826 ("[A] hybrid standard . . . , which combines the lenient standard with some consideration of the stage-two factors, and is augmented by [various] practical considerations . . . , strikes the proper balance between the traditional stage-one and two standards.").[2]

## DISCUSSION

Applying the above standards to the record here, the Court finds that Plaintiffs' evidence is insufficient to warrant conditional certification of a nationwide collective consisting of over 7,500 IT workers with differing job descriptions employed by forty different vendors at over seventy different worksites. To be sure, there is no dispute that Citi employs some kind of Professional Plan billing structure with each vendor. (*See* Pls.' Mem. 6 n.24). But it does not follow that each IT vendor considered "nonbillable" hours *vis-à-vis* Citi to be uncompensated hours *vis-à-vis* their IT workers. In other words, Citi's common *billing* arrangement does not, in itself, "violate[] the law." *Myers*, 624 F.3d at 555. Instead, the legality of Citi's billing scheme is cast into doubt only if, at a minimum, an IT vendor had a corresponding compensation scheme that treated the Professional Plan's nonbillable work as uncompensated work. Plaintiffs must therefore offer some, even if only minimal, evidence that a given IT vendor employed such a policy. Additionally, Plaintiffs must offer some evidence that Citi could be considered a joint employer of that vendor's workers. (*See* Pls.' Mem. 17 ("For Citi to have violated the law, it eventually must be shown . . . to be Plaintiffs' joint employer.")). Plaintiffs fail to do so, although the reasons for their failure differ among the different vendors.

### A.  Vendors Other Than Judge and Axelon

---

[2]  Although it would obviously be a closer call, the Court is inclined to believe that applying the regular first-stage standard would result in the same outcome, for the reasons discussed below, but need not and does not reach the question.

With respect to thirty-eight of the forty vendors — namely, all of the vendors other than Judge and Axelon — Plaintiffs fall far short of meeting their burden. First, although Plaintiffs offer some evidence of uniform practices — for example, with respect to the "onboarding" of workers from staffing agencies and time-entry policies (*see, e.g.*, Pls.' Mem. 8, 18) — they do not show that, when it comes to the fact-intensive multi-factor test that applies to the question of joint employment, *see Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 72 (2d Cir. 2003), the workers from those vendors are similarly situated, *see Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2015) (denying conditional certification of a nationwide collective when "[t]he common proof . . . addresses only some of the relevant factors"). Second, and in any event, Plaintiffs present no evidence at all that the thirty-eight vendors shared a common plan or policy not to compensate IT workers for nonbillable hours or that all vendors classified such workers in the same way. As noted, although Plaintiffs acknowledge that Citi produced all the agreements it had with the staffing agencies at issue in the past three years (*see* Pls.' Mem. 3 n.6), they fail to submit a single one as evidence (or to hazard any explanation for that failure). The result is a complete lack of evidence that, through those agreements, Citi exerted control over those IT vendors' compensation policies, let alone evidence suggesting that Citi dictated that nonbillable hours be uncompensated.

That alone would warrant denial of Plaintiffs' motion with respect to the thirty-eight vendors other than Judge and Axelon. Additionally, however, Defendant submits evidence — albeit "[b]y way of example only" — showing that at least three of the thirty-eight vendors *did* pay for nonbillable time. (Mem. Law Opp'n Pls.' Mot. Conditional Certification (Docket No. 77) ("Def.'s Mem.") 8-9). It may well be that Defendant "cherry picked" those examples, as Plaintiffs assert. (Pls.' Reply Br. Supp. Mot. Court-Authorized Notice (Docket No. 93) ("Pls.'

11

Reply") 3 n.4). (The Court need not and does not arbitrate this sort of evidentiary dispute for purposes of this motion. *See Creely*, 789 F. Supp. 2d at 826.) But whether or not that is the case, Plaintiffs fail to put forward any evidence of their own. Put simply, the burden — minimal though it may be — is and remains Plaintiffs' burden, and they cannot satisfy a "not non-existent" burden with non-existent evidence. *Khan*, 2011 WL 5597371, at *5; *see, e.g.*, *Guaman v. 5 "M" Corp.*, No. 13-CV-03820 (LGS), 2013 WL 5745905, at *3 (S.D.N.Y. Oct. 23, 2013) ("Plaintiff's evidence of common ownership is not evidence that the same unlawful employment policy was in place at each of the four restaurants."); *Prizmic v. Armour, Inc.*, No. 05-CV-2503 (DLI) (MDG), 2006 WL 1662614, at *3 (E.D.N.Y. June 12, 2006) (denying conditional certification where the plaintiff had "not submitted *any* evidence by affidavit or otherwise to demonstrate that he and other potential plaintiffs were victims of a common policy or plan *that violated the law*" (emphasis added)).

As the parties emphasize (Docket Nos. 101, 103), Judge Engelmayer's recent rulings in two related cases — *Vasto v. Credico (USA) LLC*, No. 15-CV-9298 (PAE), 2016 WL 2658172 (S.D.N.Y. May 5, 2016), and *Martin v. Sprint/United Mgmt. Co.*, No. 15-CV-5237 (PAE), 2016 WL 30334 (S.D.N.Y. Jan. 4, 2016) — are illustrative. Both cases involved the same type of plaintiff doing the same contractor-like work, but the defendants were at different levels of remove. In *Vasto*, the plaintiffs sued Credico and the proposed collective encompassed the agents who worked for Credico; in *Martin*, the plaintiffs sued Sprint, rather than their immediate employers, and the proposed collective encompassed all agents who worked for Sprint's contractors (including Credico, one of Sprint's many contractors). In the former case, Judge Engelmayer granted nationwide certification because there was, among other things, documentary evidence that defendant Credico had a "Credico-wide policy of paying agents only

fixed-rate commissions." *Credico*, 2016 WL 2658172, at *12.  In *Martin*, by contrast, the Judge denied nationwide certification (while permitting certification with respect to a particular subset of contractors) because, among other things, "the Sprint documents on which plaintiffs rely [were] conspicuously silent as to how Agents are to be classified and paid." 2016 WL 30334, at *6.  The present case is plainly more like *Martin* than *Vasto*.  (May 12, 2016 Ltr. (Docket No. 103) 2).  (By contrast, the previous case that Plaintiffs brought against Judge itself, *see Jones v. Judge Tech. Servs. Inc.*, No. CIV.A. 11-6910, 2013 WL 5777159, (E.D. Pa. Oct. 25, 2013), more closely resembles *Vasto*).  In fact, here, the Court cannot even say whether Citi's policies are silent as to classification and wages because, as noted, Plaintiffs' do not offer any of Citi's agreements.

**B.  Axelon**

Plaintiffs have a slightly stronger case for certification as to workers at Axelon, but it ultimately falls short too.  Plaintiffs' evidence certainly suggests that opt-in plaintiff Jose Gomez — who was recruited by Axelon to work at Citi under a Professional Plan from March 2015 to February 2016 — was not paid for nonbillable hours.  Plaintiffs submit a declaration from Gomez stating as much (*see* Brooks Decl., Ex. 7 ¶¶ 4-6), as well as Gomez's contract with Axelon, Exhibit A of which states that "[e]mployee shall be paid only for each billable hour actually worked" and that "according to [Citi's] Professional Day Time Template . . . the 9th and 10th hour worked in a given day are not billable."  (Brooks Decl., Ex. 19, Ex. A).[3]  But Plaintiffs submit *no* evidence about *other Axelon* employees' compensation.  To be sure, Gomez's

---

[3]     Notably, Gomez's contract also states that "EMPLOYEE AGREES THAT H/SHE IS SOLELY AN EMPLOYEE OF [AXELON] AND . . . IS NOT FOR ANY PURPOSES WHATSOEVER . . . AN EMPLOYEE OF [CITI] . . . NOR WILL EMPLOYEE MAKE ANY CLAIM TO THE CONTRARY."  (Brooks Decl., Ex. 19, at 2; *see also id.*, Ex. A).

13

declaration states that he worked with "six other information technology workers" who were under a Professional Plan and that he knows "other information technology workers" who worked more than forty hours in a workweek. (Brooks Decl., Ex. 7 ¶ 7; *see also* Puma Decl., Ex. E, at 148). But those allegations do not necessarily reveal anything about *Axelon*-affiliated workers, as Citi's worksites included IT workers affiliated with multiple vendors; Gomez's worksite in Tampa, Florida, for example, had twenty-four workers affiliated with Judge alone. (*See* Brooks Decl., Ex. 23, at 5). Thus, the "other" IT workers to whom Gomez refers may or may not have been affiliated with Axelon. Nor do Plaintiffs urge, even through argument, that the Court should infer that the attachment to Plaintiff's contract was used with other Axelon-affiliated Citi contractors. Without such a request, let alone evidence to support such a request, the Court declines to do so. Thus, Plaintiffs' evidence with respect to Axelon falls short.[4]

## C. Judge

Plaintiffs' strongest arguments for conditional certification apply to Judge, but they still fall short. In support of their motion, Plaintiffs offer the November 16, 2012 deposition transcript of Katy Wiercinski, Judge's Chief Operating Officer (*see* Brooks Decl., Ex. 18); and fourteen sworn declarations from the named and current opt-in Plaintiffs who are current or former Judge employees (Brooks Decl., Exs. 1-6, 8-15). Wiercinski's testimony makes clear that, at least as of November 2012, Judge did not compensate workers for unbillable time. (*See,*

---

[4] Given the Court's rulings herein, there is reason to doubt whether Gomez's claims should be adjudicated alongside the claims of the other Plaintiffs, all of whom work or worked for Judge. The Court could await a decertification motion following the close of full discovery to make a determination of whether Gomez is "similarly situated" enough to the Judge workers to proceed here (and dismiss his claims without prejudice if it determines he is not). *See Myers*, 624 F.3d at 555. Alternatively, the Court could sever his claims now, allowing discovery to proceed separately as to the two vendors (and coordinating as appropriate). The parties shall meet and confer and be prepared to address the issue at the next case management conference.

14

*e.g.*, Brooks Decl., Ex. 18, at 79 ("He was professional day. He was paid what we were able to bill.")). Thus, a typical Professional Day worker was not paid for the ninth and tenth hours worked in a given day. (*Id.* at 31). The fourteen declarations submitted by Plaintiffs likewise state that, as Professional Plan workers, the declarants were not paid for "unbillable" time. (*See* Brooks Decl., Exs. 1-6, 8-15). In addition, the declarations include statements (as Gomez's declaration did) speaking to whether Citi can and should be treated as a joint employer. For example, the declarants state that Citi directly managed and supervised them, gave them Citi ID badges and Citi e-mail addresses, determined their hours, required them to use a Citi time-entry system, and had the power to fire them. (*See* Brooks Decl., Exs. 1-6, 8-15).

If that were all, it would probably suffice for preliminary certification purposes, whatever the standard may be. But it is not all. First, as Citi notes, the declarations from the three named Plaintiffs, which were signed in June and July 2015, were nevertheless not produced until January 2016 — *after* depositions had been taken of two of the three Plaintiffs. (Def.'s Mem. 11-12). More substantially (and more troubling, particularly in light of that belated disclosure), Plaintiffs' declarations are contradicted — in some instances, flatly — by their deposition testimony. (Def.'s Mem. 12-14). In their declarations, for example, each named Plaintiff stated explicitly that "Citi paid" him or her and that he or she was paid nothing for unbillable hours. (Brooks Decl., Ex. 6 ("Giron Decl.") ¶ 8; Brooks Decl., Ex. 9 ¶ 4; Brooks Decl., Ex. 14 ("Webb Decl.") ¶ 4). In their depositions, however, Plaintiffs all admitted that, as a matter of mechanics, Judge paid them and, more notably, that since at least December 2013 Judge *has* provided pay for "unbillable" hours. (*See* Def.'s Mem. 13-14 (chart pairing declaration statements side-by-side with inconsistent deposition testimony)). In fact, although Plaintiff Giron stated in his declaration that "I was paid nothing for unbillable hours worked" (Giron Decl. ¶ 9), it is now

15

undisputed that he *has* been paid for *all* hours, billable or unbillable, since at least April 2012 — that is, all hours within the potential three-year statute of limitations period. Similarly, Plaintiff Webb asserts in his declaration that "[*t*]hroughout my time at Citi" — from May 2011 "to the present" — "I . . . was not paid for [overtime] work although I recorded my time." (Webb Decl. ¶¶ 1, 6 (emphasis added)). In his deposition, however, Webb readily admitted that starting *from as early as December 2013 to the present*, he was "no longer paid zero hours for hours nine and ten" but was "paid $27.63 or somewhere around that." (Puma Decl., Ex. D, at 116; *see also id.* ("Q: Are you still receiving [$]27.63 for hours nine and ten? A: Yes.")).[5]

In light of the inconsistencies between Plaintiff's declarations and their depositions, not to mention the belated production of the former, the Court declines to credit the declarations. *See, e.g.*, *Morales v. Plantworks, Inc.*, No. 05-CV-2349 (DC), 2006 WL 278154, at *2 (S.D.N.Y. Feb. 2, 2006) (noting a court's "broad discretion" to make determinations with respect to

---

[5] Compounding matters, in arguing that their declarations and testimony are consistent, Plaintiffs appear to misrepresent documentary records. Specifically, they argue that when Judge began paying for "hours nine and ten" in December 2013, Judge also stopped designating those hours as "nonbillable" — suggesting that Plaintiffs' statements that they received no pay for "nonbillable" time were technically true (if misleading as a practical matter) in light of Judge's change in compensation practices. To support that argument, Plaintiffs point to pay stubs showing that, prior to December 2013, "nonbillable" hours were marked as "NO_PAY" but after the change in compensation policy, "nonbillable" hours were marked as "OTSP" (for "overtime special"). (Pls.' Reply 5; *see* Supp. Decl. Molly A. Brooks Supp. Pls.' Mot Court-Authorized Notice (Docket No. 94), Exs. E-H). A review of the pay stubs shows that the change Plaintiffs identify — from "NO_PAY" to "OTSP" — relates to entries underneath a column with the heading "Pay Code." That column, however, does not appear to refer to "billable" versus "nonbillable" hours. Instead, an adjacent column on the pay stubs, titled "Project Type," appears to refer to hours as either "billable" or "nonbillable." *That* column — *not* the column Plaintiffs misleadingly point to — labels hours as either "BILL" or "NONBILL," and it does so on Plaintiffs' pay stubs both before, *and after*, December 2013. In other words, the pay stubs simply illustrate and underscore the fact that, by December 2013, Plaintiffs were paid for nonbillable work — a fact inconsistent with Plaintiffs' statements in their sworn declarations that they were *not* paid for nonbillable work.

16

conditional certification); *see also Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 159-60 (S.D.N.Y. 2008) (declining, in certifying a class under Rule 23, to credit the parties' dueling declarations and relying instead on deposition testimony, which "[i]n some cases . . . directly contradicts the declarations"); *cf. Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (affirming dismissal of a complaint where allegations were "contradicted both by more specific allegations in the Complaint and by facts of which we may take judicial notice"); *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."). *See generally Reilly v. Natwest Mkts. Grp.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses."). Just as "it makes little sense to certify a collective action based on manifestly deficient pleadings," so too it makes little sense to certify a collective action based on self-serving declarations from the named Plaintiffs that are contradicted by their own sworn deposition testimony. *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 556 (S.D.N.Y. 2013).

Given their deposition testimony, Plaintiffs do not carry their burden of showing that the putative members of the collective are similarly situated. First, although Wiercinski's testimony suggests that, as of November 2012 (a date, it should be noted, that is beyond the FLSA statute of limitations), Judge did not pay some workers for nonbillable work, the experience of Giron, who was compensated for nonbillable work since at least April 2012, suggests that such a practice was not uniform. Second, to the extent that Judge workers were not compensated for nonbillable hours, Plaintiffs fail to show that *Citi* bore any responsibility for the practice. As already noted, Plaintiffs do not offer *any* of the agreements between Citi and its contractors

(including Citi's agreement with Judge), and the evidence of Citi's uniform onboarding policies and close-to-uniform time-entry policies is not enough to make Citi a joint employer of all its vendors' IT workers. To be sure, there are boilerplate allegations in Plaintiffs' declarations that point toward Citi being treated as a joint employer with Judge. (*See* Pls.' Mem. 8-10). But separate and apart from the reasons to be skeptical of those declarations, the record makes plain that there are material differences among Judge workers with respect to Citi: whereas some worked from Citi locations and had access to Citi systems, others worked elsewhere or lacked access to Citi's systems. (Gruppuso Decl. ¶¶ 20-23). (For example, Plaintiff Webb works from his home and has only been to a Citi location twice in years. (Puma Decl., Ex. D, at 29-30, 240).) It follows that Plaintiffs fail to show, even with respect to Judge's workers alone, that *Citi* employed a "common policy or plan that violated the law." *Myers*, 624 F.3d at 555.

Finally, even if Plaintiffs could otherwise meet their burden with respect to Judge workers, preliminary certification of a collective action in the unique circumstances presented here would not promote efficiency. *See, e.g.*, *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (noting that the collective-action process is intended to enable the "efficient resolution in one proceeding of common issues of law and fact"); *Trinidad*, 962 F. Supp. 2d at 556 ("The court's discretionary power to facilitate the sending of notice to potential class members is premised on its use as a tool for efficient case management."). In particular, distributing notice to hundreds, if not thousands, of Judge workers would be inappropriate because this is not Plaintiffs' first bite at the collective-action apple. As noted, Plaintiffs brought an earlier case in the Eastern District of Pennsylvania against Judge itself, a case that settled after notice was distributed to Judge workers and years of litigation. Notably, Plaintiffs' allegations in that suit were the same as their allegations here, and they were represented by the same counsel

there as they are here. Even more notably, they "sought and received third-party discovery from Citi, and threatened to join Citi as a party." (Def.'s Mem. 23). Plaintiffs provide no explanation in this suit for why they opted not to name Citi as a party in the case against Judge. And although it may be that that decision does not have preclusive effect on Plaintiffs' ability to sue Citi, *see Korenblum v. Citigroup, Inc.*, No. 15-CV-3383 (JMF), 2015 WL 6001275, at *1 (S.D.N.Y. Oct. 14, 2015), it does bear on the efficiency of certifying a collective action and sending another round of notice to substantially the same population. Put simply, to the extent that the collective-action process is intended to promote efficiency, the law should not allow, and thus encourage, plaintiffs to bring piecemeal litigation in the way that Plaintiffs have done here; instead, it should incentivize plaintiffs to name all relevant parties in a single suit and thus ensure that notice, if given, is provided in the most efficient manner possible. In short, certifying a collective action and authorizing notice with respect to Judge alone would undermine rather than promote efficiency, and the Court — exercising its discretion — declines to go that route.[6]

## CONCLUSION

---

[6] Although not necessarily a factor in the preliminary certification inquiry, *see Romero v. La Revise Assocs., L.L.C.*, 968 F. Supp. 2d 639, 647 (S.D.N.Y. 2013), the Court notes that workers who signed new employment contracts with Judge after May 2012 apparently agreed to arbitrate their claims (*see* Turano Decl. ¶ 9), making it highly likely that the claims of any such workers would ultimately be dismissed, *see Jones v. Judge Tech. Servs. Inc.*, No. CIV.A. 11-6910, 2014 WL 3887733, at *8 (E.D. Pa. Aug. 7, 2014) (dismissing claims of opt-in plaintiffs who signed Judge employment contracts containing arbitration clauses). Given that, the fact that Judge started compensating its workers for unbillable time at least as of December 2013, and the maximum three-year statute of limitations for FLSA claims, *see O'Jeda v. Viacom, Inc.*, No. 13-CV-5658 (JMF), 2014 WL 1344604, at *2 n.1 (S.D.N.Y. Apr. 4, 2014), the relief a collective could obtain would, at most, be limited to employees who performed work for Judge and Citi from approximately July or August 2013 through November 2013 under a contract signed prior to May 2012 (a group that excludes even some of the current opt-in Plaintiffs (*see* Brooks Decl., Ex. 1 ¶ 1 (Anna Altschuller stating in her declaration that she "worked at [Citi] from about December 2010 to about April 2011")). The Court does not know how large that group is, but it is obviously a fraction of all Judge-Citi workers.

In sum, Plaintiffs' motion for conditional certification of a collective action is DENIED. The parties are hereby ORDERED to appear for a conference with the Court on **August 2, 2016**, at **3:45 p.m.** in **Courtroom 1105** of the Thurgood Marshall Courthouse, 40 Centre Street, New York, New York.  On the Thursday prior to the conference (*i.e.*, **July 28, 2016**), the parties shall submit a new proposed case management plan to govern remaining discovery (*see* Docket No. 48 ¶ 6), as well as a joint letter updating the Court on the status of any settlement discussions (*see id.* ¶ 11).

The Clerk of Court is directed to terminate Docket No. 72.

SO ORDERED.

Date: July 19, 2016
New York, New York

_____
JESSE M. FURMAN
United States District Judge